UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J.S. HELD LLC,<br><br>        Plaintiff,<br><br>v.<br><br>TRACEY DODD,<br><br>        Defendant. | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff J.S. Held LLC ("J.S. Held" or "Plaintiff"), by and through its undersigned counsel, alleges the following against Defendant Tracey Dodd ("Dodd" or "Defendant"):

## NATURE OF ACTION

1. In exchange for millions of dollars in cash from the sale of her own company and equity interests in the J.S. Held corporate group, Dodd agreed and promised in three (3) separate contracts that for two years after the termination of her employment with J.S. Held, she would not perform work for a J.S. Held competitor or provide services offered by J.S. Held.

2. Just months after Dodd abruptly resigned in November 2020, however, J.S. Held learned that she had been working for a direct competitor, providing the same consulting services she offered for several years as an employee of J.S. Held.

3. As a result, J.S. Held has been left with no choice but to commence this action to enforce the restrictive covenants Dodd agreed and promised to abide by, to halt Dodd's improper conduct, and to be made whole after Dodd denied it the benefit of the bargained-for exchange to which it was entitled based on Dodd's contractual obligations. This relief includes but is not necessarily limited to the forfeiture of the proceeds Dodd received from the equity J.S. Held bought back in reliance on Dodd's false representations that she would not engage in competitive

employment.

## THE PARTIES

4. J.S. Held is a Delaware limited liability company that is a citizen of New York because its Members are both citizens of New York headquartered in Jericho, New York.

5. Dodd is a former employee of J.S. Held who, upon information and belief, resides in the State of Louisiana and is a citizen of that State.

## JURISDICTION, VENUE AND GOVERNING LAW

6. This Court has diversity jurisdiction over Plaintiff's claims against Dodd pursuant to 28 U.S.C. § 1332 because Dodd and Plaintiff are citizens of different States, and the amount in controversy exceeds $75,000.

7. Venue is proper in this District, and this Court has personal jurisdiction over Dodd and Plaintiff's claims in this matter pursuant the express consent contained in the Purchase Agreement (defined below), which provides that the agreement "shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware," that "[e]ach party irrevocably submits to the exclusive jurisdiction of (a) the State of Delaware, and (b) the United States District Court for the District of Delaware, for the purposes of any action arising out of [the Purchase Agreement] or any transaction contemplated [t]hereby," and that parties "agree[] to commence any such action either in the United States District Court for the District of Delaware or if such action may not be brought in such court for jurisdictional reasons, in the state courts of the State of Delaware." Purchase Agreement §§ 7.5, 7.6.

## FACTUAL ALLEGATIONS

**A.     Dodd Plays A Key Role In J.S. Held's Business**

8. J.S. Held is a global consulting firm that provides specialized technical, scientific, financial, and advisory services throughout a wide range of sectors, including construction,

energy, hospitality, legal, and environmental compliance.

9. In September 2016, J.S. Held acquired substantially all of the assets of U.S. Health and Environmental Liability Management, LLC ("U.S. HELM") (the "Purchase"), a consulting firm that focused on environmental risk assessment, corrective action, industrial hygiene, safety and environmental consulting. Dodd was the founder and co-owner of U.S. HELM.

10. J.S. Held's acquisition of U.S. Helm was a platform entry into a new practice line and area of subject matter expertise in which J.S. Held did not previously operate. Following the Acquisition, Dodd became J.S. Held's Executive Vice President and National Director of Health & Environmental Services. In that capacity, she established and led the Environmental Health and Practice for J.S. Held, grew and maintained J.S. Held's client base, conducted client outreach and marketing, and acted as a testifying expert witness and a subject matter expert on behalf of J.S. Held and its clients.

**B.  Dodd Agrees To Certain Restrictive Covenants In Exchange For Millions of Dollars In Equity Grants And Cash.**

11. In connection with the Purchase, on September 29, 2016, Dodd executed (a) an Asset Purchase Agreement (the "Purchase Agreement") and (b) a Restricted Incentive Grant Agreement (the "Initial Grant Agreement"), pursuant to which Dodd received certain units of membership interests (sometimes referred to herein as "Units") in an affiliate of J.S. Held.

12. Dodd and the co-owner of U.S. HELM received $4,000,000 in aggregate consideration pursuant to the Acquisition (the "Purchase Price").

13. In consideration of the Purchase Price paid in connection with the Acquisition, Dodd agreed to be bound by certain restrictive covenants contained in the Purchase Agreement. Specifically, among other covenants, Dodd agreed that for two years following the termination

of her employment with J.S. Held or any of its subsidiaries (the "Initial Covenants Restricted Period"), she would not, directly or indirectly, engage in certain activities, including any Restricted Business. Restricted Business is defined in the Purchase Agreement as:

> [T]the business as conducted by [J.S. Held] from time to time including providing the services of damage consulting and estimating, construction consulting and estimating, insurance claims consulting, property replacement cost appraisals, expert testimony and litigation support, dispute resolution, project monitoring and clerking, water and smoke restoration consulting, surety services, construction engineering, construction project scheduling, construction project management, cost and bid package analysis, construction budgeting, builder's risk consulting, construction defect consulting, construction restoration and analysis, risk management, health and safety compliance and consulting, disaster recovery and environmental assessments.

14. The Purchase Agreement further prohibits Dodd from soliciting or enticing, or attempting to solicit or entice, or do business with, any clients or customers of J.S. Held or any of its subsidiaries or affiliates or potential clients or customers of J.S. Held or any of its subsidiaries or affiliates.

15. Dodd acknowledged in the Purchase Agreement that such restrictions "are reasonable and necessary to protect the legitimate interests of [J.S. Held] and constitute a material inducement to [J.S. Held] to enter into this Agreement and consummate the transactions contemplated by this Agreement," and that in the event of any violation, J.S. Held would be entitled to "injunctive relief, . . . as well as an equitable accounting of all earnings, profits and other benefits arising from any violation . . . , which rights shall be cumulative and in addition to any other rights or remedies to which [J.S. Held] may be entitled."

16. Dodd also acknowledged and agreed that the Initial Covenants Restricted Period "shall be extended for an additional period equal to any period during which Dodd . . . or any of [her] respective affiliates is in breach of its obligations" under the relevant restrictive covenants.

17. Pursuant to Section 6.1 of the Purchase Agreement, "[a]ll covenants and agreements of the parties contained [in the Purchase Agreement] shall survive the Closing

indefinitely or for the period explicitly specified therein."

18.     In addition, in exchange for the Units received under the Initial Grant Agreement, Dodd agreed to be bound by certain restrictive covenants contained in a Covenants Agreement set forth in Annex C to the Initial Grant Agreement.  Specifically, among other covenants, Dodd agreed that for the Initial Covenants Restricted Period, she would not, directly or indirectly, engage in certain activities, including any Restricted Business, which is defined as set forth in the Purchase Agreement.

19.     The Initial Grant Agreement also prohibits Dodd from soliciting or enticing, or attempting to solicit or entice, any clients or customers of J.S. Held Management LLC or any of its subsidiaries or affiliates or potential clients or customers of the J.S. Held Management LLC or any of its subsidiaries or affiliates, which includes J.S. Held.

20.     Dodd acknowledged in the Initial Grant Agreement that the services she provided for J.S. Held were "of a unique nature and that it would be difficult or impossible to replace such services and that by reason thereof ," J.S. Held, "in addition to any other rights and remedies available under this Contract or otherwise, shall be entitled to an injunction to be issued or specific performance to be required restricting . . . Dodd from committing or continuing any . . . violation [of the restrictive covenants in the Initial Grant Agreement]."

21.     Dodd also acknowledged and agreed that the restrictive covenants in the Initial Grant Agreement would "survive any transaction, forfeiture of Incentive Units, or termination of employment or service" and would "terminate only in accordance with the provisions in the Operating Agreement and Annex C hereto."

22.     Pursuant to Annex C of the Initial Grant Agreement, the restrictive covenants contained therein "shall survive any sale of the Company or termination of employment or

service."

23. The "Operating Agreement" as defined in the Initial Grant Agreement refers to the Limited Liability Company Agreement of J.S. Held Management LLC (as amended from time to time). The Operating Agreement ceased to be effective as a result of the 2019 Sale Transaction (as described below).

24. The Initial Grant Agreement further provides that in Section 6(f) that "if . . . Dodd has at any time before or after her Separation from Service breached any covenant in the Purchase Agreement, the Operating Agreement or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition or non-solicitation covenant or agreement with the Company or any of its Affiliates or Subsidiaries during the periods referenced in such agreement, any Unrestricted Incentive Units held by the Grantee and subject to this Agreement shall be forfeited on such date."

25. In 2019, J.S. Held Holdings LLC, the parent holding company of J.S. Held, was acquired by way of a merger (the "2019 Sale Transaction"). In connection with the 2019 Sale Transaction, Watchtower Management Holdco, LLC ("Management Holdco") was formed for purposes of facilitating employees of J.S. Held and its subsidiaries who, like Dodd, held equity in the pre-merger J.S. Held corporate group to own equity in the new corporate group following the 2019 Sale Transaction.

26. The equity securities of Management Holdco represent an indirect interest in the equity securities of Watchtower Topco, LLC ("Topco"), the ultimate parent of the J.S. Held corporate group.

27. Pursuant to a Securities Purchase Agreement and Plan of Merger, dated as of May 16, 2019 (the definitive acquisition agreement governing the 2019 Sale Transaction) and a

Redemption, Distribution and Contribution Agreement, dated June 28, 2019 (the "Exchange Agreement"), all of the unvested Units that Dodd had received pursuant to the Initial Grant Agreement were replaced with Units of Management Holdco. Dodd executed and is a party to the Exchange Agreement.

28.   As described in the recitals to the Exchange Agreement, each Management Member (as defined therein), including Dodd, is subject to a Rollover Agreement (as defined therein) "setting forth the terms and conditions upon which" the Units owned by such Management Member prior to the 2019 Sale Transaction were to be exchanged for Units of Management Holdco. The Rollover Agreement to which Dodd is subject refers to that certain letter, dated June 25, 2019, from J.S. Held to Dodd (the "Dodd Rollover Letter").

29.   Pursuant to the Dodd Rollover Letter, Dodd executed a joinder enclosed therewith. As described by the Dodd Rollover Letter:

> By signing the joinder, you will (i) become a member of [Management Holdco] in respect of your Restricted Common Units, effective upon the closing of the Transaction and (ii) consent to the assignment of the restrictive covenant agreement that you entered into in connection with the grant of your Unvested Units to J.S. Held LLC. **You will not be required to enter into any new restrictive covenant agreement in respect of your Restricted Common Units issued in exchange for your Unvested Units, and will instead continue to be subject to your existing covenant agreement.**

The joinder Dodd signed pursuant to the foregoing is enclosed with the Dodd Rollover Letter.

30.   Pursuant to an Incentive Unit Grant Agreement, dated July 1, 2019 (the "Second Grant Agreement"), Dodd received additional Units of Management Holdco.

31.   In exchange for the Units of Management Holdco received under the Second Grant Agreement, Dodd agreed to be bound by certain restrictive covenants contained in a Covenants Agreement set forth in Annex B to the Second Grant Agreement. Specifically, among other covenants, Dodd agreed that for two years following the termination of her employment,

she would not, directly or indirectly, engage in certain activities, including the business of any Competitor. Competitor is defined in the Second Grant Agreement as:

> [A]ny other person engaged, directly or indirectly, in whole or in part, in the same or similar business as any member of the Company Group at any time anywhere in the world . . . , including those engaged in the business of providing the services of damage consulting and estimating, construction consulting and estimating, insurance claims consulting, property replacement cost appraisals, expert testimony and litigation support, dispute resolution, project monitoring and clerking, water and smoke restoration consulting, surety services, construction engineering, construction project scheduling, construction project management, cost and bid package analysis, construction budgeting, builder's risk consulting, construction defect consulting, and construction restoration and analysis . . . ."

32. The Second Grant Agreement further prohibits Dodd from directly or indirectly soliciting or enticing, or attempting to solicit or entice, "any clients or customers of any member of the Company Group or potential clients or customers of any member of the Company Group." The "Company Group" is defined as, among other things, any subsidiary or affiliate of Topco, which includes J.S. Held.

33. Dodd acknowledged in the Second Grant Agreement that the services she provided to J.S. Held were "of a unique nature and that it would be difficult or impossible to replace such services and that by reason thereof ," J.S. Held, "in addition to any other rights and remedies available under this Contract or otherwise, shall be entitled to an injunction to be issued or specific performance to be required restricting [Dodd] from committing or continuing any . . . violation [of the restrictive covenants in the Second Grant Agreement]."

34. Dodd also acknowledged and agreed that the restrictive covenants in the Second Grant Agreement would "survive any transaction, forfeiture of Incentive Units, or termination of employment or service" and would "terminate only in accordance with the provisions of <u>Annex B</u> hereto."

35. Pursuant to Annex B of the Second Grant Agreement, the restrictive covenants contained therein "shall survive any sale of [Management Holdco] or Topco or termination of

employment or service."

36. The Second Grant Agreement further provides in Section 5(g) that "in the event of a Restrictive Covenant Breach, each Incentive Unit held by [Dodd] and subject to this Agreement, whether vested or unvested, shall be forfeited on such date."

37. Section 6 of the Second Grant Agreement provides that "the Covenants Agreement shall inure to the benefit of, and be enforceable by, Topco, Holdco and each of their respective Subsidiaries and Affiliates." J.S. Held is a subsidiary of Topco.

**C.     Dodd Abruptly Resigns But Remains Subject To The Restrictive Covenants.**

38. Dodd abruptly resigned her employment with J.S. Held effective November 18, 2020.

39. On December 22, 2020, Dodd signed a Separation of Employment Agreement and General Release with J.S. Held (the "Separation Agreement"). Under the Separation Agreement, J.S. Held agreed, among other things, to pay Dodd $1,025,475 (the "Stock Repurchase Amount") for all of the remaining vested equity she held in the J.S. Held corporate group, including the Units conveyed to Dodd in the Initial Grant Agreement (and exchanged pursuant to the Exchange Agreement) and the Second Grant Agreement.

40. As provided by the Separation Agreement, the Stock Repurchase Amount was "a mutually agreed fair market value for any and all of [Dodd]'s ownership" of such equity.

41. J.S. Held has since paid Dodd the Stock Repurchase Amount in accordance with the provisions of the Separation Agreement.

42. In Section 10 of the Separation Agreement, Dodd acknowledged and agreed that she no longer had any further rights with respect to any equity interests in J.S. Held or its corporate group, under the grant agreements or otherwise, and that she nevertheless remained subject to certain restrictive covenants agreed to under the Purchase Agreement, Initial Grant

Agreement, and the Second Grant Agreement.

**D.    Dodd Violates Her Restrictive Covenants.**

43.    Despite her contractual obligations under her restrictive covenants with J.S. Held, Dodd began working for EFI Global, a global consulting firm and direct competitor of J.S. Held.

44.    Like J.S. Held, EFI Global provides, among other things, damage consulting and estimating, construction engineering, litigation support, health and safety compliance and consulting, and environmental risk assessment and risk-based remediation design and oversight.

45.    In or around February 2021, a J.S. Held client retained Dodd and EFI Global to perform services in connection with a hospital damaged by winter storms in Houston, Texas, including, upon information and belief, health and safety compliance and consulting, disaster recovery and environmental assessments, water restoration consulting, damage consulting and estimating, and insurance claims consulting.

46.    Upon information and belief, Dodd's work for EFI Global is ongoing and includes services to J.S. Held's actual and prospective clients, the same services she provided to J.S. Held clients during her employment with J.S. Held.

## COUNT I
## BREACH OF CONTRACT

47.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

48.    The Purchase Agreement, Initial Grant Agreement, and Second Grant Agreement (the "Agreements") are valid and enforceable contracts governed by Delaware law.

49.    Plaintiff performed all of its obligations specified within the Agreements.

50.    Pursuant to the Agreements, Dodd agreed to, among other things, not perform work for a J.S. Held competitor or provide services offered by J.S. Held, including health and

safety compliance and consulting, disaster recovery and environmental assessments, water restoration consulting, damage consulting and estimating, and insurance claims consulting.

51. Dodd also agreed in the Agreements not to solicit or do business with any J.S. Held clients for two years following the termination of her employment with J.S. Held.

52. Dodd has breached and continues to breach her non-compete and non-solicit obligations to Plaintiff by working in a directly competitive role for EFI Global.

53. As a result of Dodd's breaches, J.S. Held has suffered and continues to suffer damage in an amount to be proven at trial.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

54. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

55. A covenant of good faith and fair dealing is implied in every contract in Delaware. Through her conduct, as alleged herein, including her deliberate misrepresentations to J.S. Held about her restrictive covenants, her direct and unfair competition with J.S. Held, and her solicitation of J.S. Held's clients, Dodd has breached the implied covenant of good faith and fair dealing.

56. As a direct and proximate result of Dodd's breaches of the implied covenant of good faith and fair dealing, J.S. Held has suffered and continues to suffer damage in an amount to be proven at trial.

## COUNT III
## UNJUST ENRICHMENT

57. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

58. Dodd unfairly benefited, at Plaintiff's determinant, from her misconduct as alleged herein.

59. Among other things, Dodd obtained millions of dollars from J.S. Held, including a buyout of all of her equity, in exchange for agreeing to certain restrictive covenants.

60. Plaintiff would not have agreed to purchase Dodd's equity, had it known Dodd intended to breach her contractual obligations.

61. Dodd's conduct is without justification and has caused and will continue to cause damage to Plaintiff for which there is no remedy provided under the law.

## COUNT IV
## FRAUDULENT INDUCEMENT TO CONTRACT

62. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

63. At all times following her resignation from J.S. Held but prior to her execution of the Separation Agreement, Dodd had no intent to honor her restrictive covenants with Plaintiffs. In fact, upon information and belief, Dodd began working for EFI Global in December 2020 and had accepted a job offer from that company prior to her signing the Separation Agreement.

64. Despite her true intention to secure employment with a direct competitor of J.S. Held, Dodd signed the Separation Agreement misrepresenting to Plaintiff that she would honor her non-compete obligations.

65. Plaintiff reasonably relied upon both the affirmative misrepresentations and concealments of Dodd to its detriment and was damaged and fraudulently induced into entering into the Separation Agreement as a result.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Issue a permanent injunction restraining and enjoining Dodd from breaching any of the restrictive covenants in the Agreements;

2. Order Dodd to forfeit all compensation and equity (and all proceeds therefrom) received under the Agreements;

3. Award damages in an amount to be proven at trial;

4. Award costs and expenses associated with Plaintiffs' efforts to stop Dodd's improper competition, including reasonable attorneys' fees;

5. Award pre-judgment and post-judgment interest; and

6. Award such other and further legal or equitable, injunctive, and/or declaratory relief as the Court may deem necessary and appropriate.

Dated: April 14, 2021    MORGAN, LEWIS & BOCKIUS LLP

/s/ Jody C. Barillare
Jody C. Barillare (#5107)
1201 North Market Street - Suite 2201
Wilmington, DE 19801
(302) 574-3000
jody.barillare@morganlewis.com

August W. Heckman III (*Pro Hac Vice forthcoming*)
Jason J. Ranjo (*Pro Hac Vice forthcoming*)
Princeton, NJ 08540
(609) 919-6700
august.heckman@morganlewis.com
jason.ranjo@morganlewis.com

*Attorneys for Plaintiff*